CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

OCT 08 2008

JOHN A CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CHRISTOPHER MCINTYRE,<br><br>*Plaintiff,*<br><br>v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>*Defendant.* | CIVIL ACTION No. 3:08-cv-00029<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), is before the Court upon consideration of the parties' cross-motions for summary judgment (docket nos. 13 and 15), the ensuing responses and replies, and the parties' arguments in support of their motions, presented by counsel at a hearing on September 29, 2008. For the reasons stated herein, I will grant Plaintiff's motion for summary judgment and deny Defendant's motion for summary judgment. Furthermore, Plaintiff's motion includes a request for an award of attorney's fees and costs, which I will grant; accordingly, I will direct Plaintiff's counsel to file a complete petition for attorney's fees and costs. I will also direct Plaintiff's counsel to submit a proposed order of judgment calculating the exact back benefits and pre-and post-judgment interest due and owing as of the date of judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Christopher McIntyre ("Plaintiff") was diagnosed in 2005 with Type I diabetes (and consequent insulin dependence). Until that diagnosis, he earned a living as an airplane pilot,

---

[1] The facts have been adduced from the record. The administrative record in this case is paginated M-001 through M-330, and the parties have adopted that form of citation, which I will also employ. The facts are uncontroverted except where noted otherwise. I will introduce additional facts as necessary in my discussion.

most recently working for Gannett Co., Inc. ("Gannett"), through which he was covered by a long-term disability ("LTD") plan (also "the Plan") that was administered initially by Prudential, and later by Defendant, Aetna Life Insurance Company.

Plaintiff is a 39-year-old married man and father of a toddler. He was employed as an airplane pilot by Gannett from April 2000 to May 6, 2005, his last day of work before diabetes forced him off the job. The record indicates that Plaintiff's sole duty was to fly executives of Gannett to their chosen destinations. In late 2004, while he was still a pilot for Gannett, Plaintiff incorporated and began to operate a side business, a screen-printing company called Ink Works, which has always operated at a loss.[2]

Subsequent to his diagnosis as an insulin-dependent diabetic, Plaintiff was permanently grounded by the Federal Aviation Administration ("FAA"), and lost his aviation career and livelihood forever. The FAA refuses licensure to anyone with Plaintiff's medical condition. (M-027.) An endocrinologist opined that Plaintiff "can perform any work except for flying an airplane. He has no restrictions related to his physical capacity."[3] (M-092.)

Plaintiff was an eligible participant in Gannett's LTD plan.[4] (M-001-018.) The Plan grants the Plan Administrator (also "Administrator) the discretion to determine eligibility. (M-013.) The Plan indicates that Gannett pays money into a trust to fund the payment of disability

---

[2] Plaintiff was a 100% partner of the company; another partner had a capital investment interest. At the hearing on September 29, 2008, Plaintiff's counsel stated that the company no longer exists and that it never turned a profit.

[3] The record indicates that, pursuant to FAA regulations, Plaintiff is precluded also from any kind of in-air flight-related work, including work as a flight instructor or flight engineer. (M-092.) The Plan Administrator made determinations, discussed *infra*, regarding the types of work it considers suitable for Plaintiff. (*Id.*)

[4] It is undisputed that Plaintiff worked at Gannett for the requisite number of years to be eligible for LTD and that, in accordance with Section II of the Plan, subtitled "Eligibility," he was "actively at work and eligible to participate in the Plan when the disability occur[ed]. . . ."

benefits, and that "[t]he funds contributed to the Trust shall be held for the exclusive purpose of providing benefits under the Plan and defraying reasonable expenses of administering the Plan. . . ." (M-012.) The Plan directs the Plan Administrator (now Aetna) to develop a "funding policy" that will "ensure the proper liquidity of the Trust." (M-013.)

The Plan states, in Section III, "Synopsis of Plan": "An eligible employee who becomes disabled will receive a benefit commencing after 26 continuing weeks of his or her disablement in an amount equal to 60 percent of his or her basic monthly compensation, including other disability benefits to which he or she becomes entitled." (M-018.) The Plan includes the following "Definition of Disability," quoted in pertinent part:[5]

> Disability exists when, due to a medically determinable sickness or accidental injury, all of the following conditions are met: (a) the person is unable to perform the material and substantial duties of his or her occupation for two years and unable thereafter to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience; (b) the person is not working at any job for wage or profit (unless as expressly authorized pursuant to the rehabilitation rules of this Plan); and (c) the person is under the regular care of a physician. The two-year period referred to in (a) is measured from the date immediately following the 26 continuous week elimination period set forth in [Section] III, ["Synopsis of Plan,"] above.
>
> * * *
>
> **In the case of airline pilots, the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure are included within the definition of disability.** Notwithstanding the foregoing, however, if the failure to pass is due to a drug or alcohol-related reason, the failure to pass is not included in the definition and no benefits are payable therefor under this Plan.

(M-017-18; emphasis added.)

---

[5] Two paragraphs have been elided; these paragraphs address the exclusion of disabilities resulting from attempted suicide, self-inflicted injuries, acts of war, mental illness, alcoholism, and drug addiction.

Case 3:08-cv-00029-NKM-BWC Document 26 Filed 10/08/08 Page 3 of 20 Pageid#: 256

Plaintiff applied for LTD benefits with Prudential, Defendant's predecessor as the Plan Administrator. In a letter dated January 26, 2006, Prudential informed Plaintiff that it had determined that he was eligible for benefits effective November 5, 2005.[6] (M-033.) That letter included the following statements:

> Under the terms of the Plan you must meet the following definition of disability.
>
> Disability exists when, due to a medically determinable sickness or accidental injury, all of the following conditions are met; [sic] (a) the person is unable to perform the material and substantial duties of his or her occupation for two years and unable thereafter to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience; (b) the person is not working at any job for wage or profits (unless as expressly authorized pursuant to the rehabilitation rules of the Plan); and (c) the person is under the regular care of a physician. The two-year period referred to in (a) is measured from the date immediately following the 26 continuous week elimination period.
>
> In addition under the Gannett Plan, In [sic] the case of airplane pilots, the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure are included within the definition of disability. . . .

(M-033.) Plaintiff was informed that the payment of LTD benefits would continue for the periods established by the Plan, one of which was until "the date of disability ceases."[7] (M-31-33; M-94.) Plaintiff was initially awarded a monthly benefit of $2,878.30, and it appears that he received this payment for about a year.[8] (M-032; M-017.) As already observed, the LTD Plan

---

[6] The period from May 6, 2005, to November 5, 2006, represents the lapse of the 26-week elimination period referred to in Sections III and IV.

[7] The Plan has specific sections, not at issue in the instant action, addressing "Benefits" and "Duration of Benefits."

[8] As stated *infra*, on November 30, 2006, the Plan Administrator sent Plaintiff a letter demanding $18,496.82 for alleged overpayments made from November 5, 2005, to October 31, 2006. (M-080.)

-4-

pays 60 percent of an eligible participant's basic monthly compensation. Prudential based Plaintiff's disability award on a monthly salary of $4,797.17.[9] (M-030.)

Prudential continued to monitor Plaintiff's situation. On March 25, 2006, in response to a vocational rehabilitation inquiry from Prudential, asking "How long have you been actively searching for a job?" Plaintiff responded, "Am starting my own business, operates at a loss." (M-50.) The Plan required Plaintiff to apply for Social Security Administration ("SSA") disability benefits; the Plan contains specific language stating that it offsets its award by the amount of other disability benefits. (M-016.) On March 31, 2006, Plaintiff's claim for SSA benefits was disapproved on the ground that Plaintiff was capable of engaging in substantial gainful activity, given that his monthly earnings averaged over $860. (M-257; M-127-123; M-56-61.) On May 3, 2006, Prudential's internal notes observe that Plaintiff has "his own business which is currently operating at a loss." (M-092.) Prudential's notes for May 3, 2006, also indicate Prudential's intention to refer Plaintiff for job placement because it had determined that he "will likely qualify for occupations such as electronic and electromechanical assembly and microcomputer support specialist" with "[a]nticipated wages between $14 to $22/hr."[10] (M-092.) Prudential's notes for May 22, 2006, indicate that it planned to talk to Plaintiff "regarding another job or going to school." (M-090.)

On August 28, 2006, Prudential's notes indicate that Plaintiff "can't be a pilot because he can't renew his license while using insulin. He is disabled for his own occupation under the

---

[9] Plaintiff's annual compensation equals $57,566. (M-133.)

[10] This wage range averages to $18.00 per hour. The average wage of $18.00 per hour results in the following gross compensation: $720.00 per week; $2,880.00 per month; and $34,560.00 per year. The top of that range, $22.00 per hour, results in the following gross compensation: $880.00 per week; $3,520.00 per month; and $42,240.00 per year. A wage of $14.00 per hour, the bottom of that wage range, results in the following gross compensation: $560.00 per week; $2,240.00 per month; and $26,880.00 per year.

Gannett plan." (M-086.) Prudential further noted that Plaintiff had informed them that "he was performing self employment" and that it intended to "request an [sic] evaluate 2005 tax information." Prudential requested – and obtained – the tax information. Prudential also initiated a surreptitious investigation; the investigator reported, *inter alia*, that a requested "gym canvass" had led to "no information . . . suggesting the possibility that [Plaintiff] works out at a gym." (M-96-101.) The investigator recommended "conducting a weekend day of surveillance in an attempt to see him maintaining his lawn or property."

On October 17, 2006, Prudential informed Plaintiff that it had determined that, even though Plaintiff's screen printing company was not profitable, the fact that the company had reported income rendered Plaintiff ineligible for benefits because Plaintiff was "working for wage or profit."[11] (M-078-79; M-085.) On November 30, 2006, the Plan Administrator sent a letter to Plaintiff demanding $18,496.82 for alleged net overpayments made from November 5, 2005, to October 31, 2006. (M-080.) Plaintiff has not repaid any portion of the alleged overpayments.

In the ensuing months, Gannett terminated its relationship with Prudential and selected Aetna as its new Plan Administrator. Plaintiff hired counsel and initiated an administrative appeal, arguing that the "specific definition of disability applying solely to airplane pilots who [have] lost their necessary licensure due to a medical issue does not include requirements either that they not be working at any job for wage or profit or that they be under the regular care of a physician"; rather, Plaintiff argued, "[t]hose are requirements in the general . . . definition of

---

[11] It is clear that, as a partner in Ink Works, Plaintiff lost $23,000 in 2005 and over $12,000 in 2006. (M-255, 292, 296.) An October 6, 2006, memorandum from a member of Prudential's Risk Management department in Livingston, New Jersey acknowledges Plaintiff's losses as a partner in Ink Works, and requests that a Disability Consultant with Prudential in Philadelphia, Pennsylvania "advise this office if the findings [regarding Ink Works] demonstrate activity by the claimant which is inconsistent with his claimed medical disability." (M-068, M-072.)

-6-

disability, but not the specific one applying directly to [Plaintiff]." Plaintiff further argued that, even were he subject to the general definition of disability spelled out in the first paragraph of the Plan's "Definition of Disability," he would meet those requirements as well, because he was not "working at any job for wage or profit." He acknowledged that he had the "tiny" screen printing business, but that he had it "before he became disabled," and that "it has <u>never</u> returned a dime of profit to [Plaintiff]." Thus, according to Plaintiff, he met the general definition of disability because he "did not earn a wage or profit from his little company. . . ." (M-142-45.)

The appeal was denied by Aetna on August 13, 2007. (M-257.) After confirming that Plaintiff's first date of disability was May 7, 2005, and that he had received LTD benefits until October 31, 2006, Aetna stated that Prudential had terminated Plaintiff's coverage because it had "received notification that [Plaintiff] was self employed and working," and that Aetna was upholding the denial of benefits. Aetna stated that it could not change its position until it received "[p]roof that [Plaintiff] is not working," reasoning that, "even though [Plaintiff's] company is losing money, he is still working toward making a wage or profit." Aetna added the following statement "regarding Prudential's interpretation of disability found within the Plan": "You base this appeal on your interpretation that airplane pilots are only subject to the one paragraph. This is not the case. All employees eligible for benefits under this Plan are subject to the definition of disability in its entirety."

Plaintiff appealed further, reemphasizing, *inter alia*, that the Administrator's reasoning "read[s] the specific section on [the disability of] pilots out of existence," that "it makes sense that the plan would have a special definition for airplane pilots" because they are often "medically unable to do their jobs for reasons that would not disable someone from doing many other regular occupations," and that "[n]o airplane pilot would value a disability policy if he

would not be covered despite the FAA's grounding him for medical reasons." (M-298-301.) Plaintiff's final appeal was denied for the same reasons the Administrator had previously given. (M-304-06.) This lawsuit ensued.[12]

## II. STANDARDS OF REVIEW

### A. Cross Motions for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If both parties have moved for summary judgment, a court should consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted). For each motion, "the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996)). The party who bears the burden of proof on an issue at trial, however, cannot survive summary judgment without forecasting evidence sufficient to sustain his or her burden of proof on that point. *Celotex*, 477 U.S. at 327.

---

[12] Plaintiff initiated this action in the Circuit Court for the City of Charlottesville, Virginia; Defendant removed the case to this Court because it is an action for plan benefits preempted by ERISA, 29 U.S.C. § 1144(a), and thus presents a federal question constituting grounds for removal to this Court pursuant to 28 U.S.C. § 1441(b).

## B. ERISA

In enacting ERISA, Congress established procedural safeguards to ensure that fiduciaries would administer employee benefit plans "solely in the interest of the participants and beneficiaries." 29 U.S.C. §§ 1104(a)(1) & 1001(b); *see also Makar v. Health Care Corp. of the Mid-Atlantic*, 872 F.2d 80, 83 (4th Cir. 1989). When reviewing a plan administrator's decision, courts should be guided by principles of trust law and "in doing so, it should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (*i.e.*, an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Metropolitan Life Insurance Company v. Glenn*, ___ U.S. ___, 128 S. Ct. 2343, 2347-48 (June 19, 2008). Trust law principles require courts to review a denial of plan benefits *de novo* unless the plan provides to the contrary. *Id.* When, as is the case here, a plan grants the administrator discretionary authority to determine eligibility for benefits, "a deferential standard of review [is] appropriate." *Id.* Nevertheless, that standard must be modified when the administrator is acting under a conflict of interest; if the administrator is acting under a conflict of interest, "[t]rust law continues to apply a deferential standard of review . . . while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Id.* at 2350.

In determining whether a fiduciary of an employee benefits plan covered by ERISA has abused its discretion in making a decision, a court may consider, but is not limited to, such factors as (1) the language of the plan, (2) the purposes and goals of the plan, (3) the adequacy of the materials considered to make the decision and the degree to which they support it, (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with

-9-

earlier interpretations of the plan, (5) whether the decision-making process was reasoned and principled, (6) whether the decision was consistent with the procedural and substantive requirements of ERISA, (7) any external standard relevant to the exercise of discretion, and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Walmart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000); Employee Retirement Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B). Courts must not "deviate from the abuse of discretion standard," but should apply the

> abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997). The modified standard deviates from the usual abuse of discretion review "only to the extent necessary to counteract any influence unduly resulting from the conflict [of interest]." *Id.*

When reviewing the discretionary decision of a plan administrator to deny employee benefits, judicial review is limited to the body of evidence before the administrator at the time it rejected the claim. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir. 1999). A Plan Administrator's decision will not be disturbed if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (citation omitted), and consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance," *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). To determine whether an administrator's decision was reasonable and based on substantial

evidence, the Court may consider the non-exhaustive list of eight factors set forth by the United States Court of Appeals in *Booth*, 201 F.3d 342-43.

### III. DISCUSSION

#### *A. Contentions*

Plaintiff states that the Plan has a specific definition of disability for pilots, and that no one disputes that he satisfies that definition, given the loss of his FAA medical certificate and licensure because of his status as an insulin-dependent diabetic. Plaintiff contends that the Administrator's interpretation of the Plan, which requires that pilots must meet both the general definition of disability and the pilot-specific definition, is untenable because it would render the specific language regarding pilots meaningless and superfluous. Plaintiff argues that there would be no need for a specific paragraph defining disability for pilots if they were subject to the general definition of disability, because fulfilling the three-prong general definition of disability would render the pilot unable to maintain the requisite FAA certification; thus, it makes sense for the Plan to have a special definition for pilots, because they are often medically unable to do their jobs for reasons that (i) would not disable others from performing their occupations and (ii) would not fulfill the requirements of the general definition of disability. "No airplane pilot," plaintiff adds, "would value a disability policy if he would not be covered despite the FAA's grounding him for medical reasons." Plaintiff maintains that there must be a reason for the additional language regarding pilots, and that the only sensible interpretation is that it is intended to protect pilots who might lose licensure for medical reasons. Plaintiff adds that pilots spend years and large sums of money to become licensed, but controllable medical issues, which have no effect on the abilities of others to earn money, can end a pilot's career and render his training useless. In Plaintiff's view, the Plan specifically contemplates this possibility, and the language

-11-

in the Plan is intended to supplant the general three-prong definition of disability for an otherwise eligible airplane pilot who loses his First Class medical certificate, fails to pass a required physical examination, and loses the necessary licensure to fly planes.

Plaintiff further contends that, even were the general three-prong definition of disability applicable to him, he would still qualify for disability under the Plan because his business never turned a profit, and the clause of the general three-prong definition that the Administrator relied upon to find him ineligible states that the claimant may not be "working at any job for wage or profit." Plaintiff maintains also that Aetna operates under a conflict of interest requiring a lessening of deference to Aetna because Aetna, as a paid Plan Administrator, "surely wishes to continue [its] relationship with Gannett and therefore has incentive to minimize the payments Gannett must make to satisfy claims." In support of this contention, Plaintiff adds that the Plan provides that the Administrator is to attempt to improve the fund's liquidity.

Defendant contends that the paragraph regarding the disability of pilots does not stand alone as the sole criteria that a pilot must fulfill in order to prove disability under the Plan.[13] Defendant maintains that the pertinent language in the paragraph defining disability for pilots is "included within," and that these two words mean that the pilot-specific definition is to be read in addition to the three-prong definition given in the first paragraph of the "Definition of Disability." In Defendant's view, the pilot-specific definition merely enlarges the general three-prong definition of disability. Otherwise, Defendant laments, Plaintiff would be "entitled to receive monthly LTD benefits continuously for the next 26 years." Defendant maintains that the

---

[13] Defendant acknowledges that it "has been unable to locate a reported case decided under ERISA presenting facts substantially similar to those found in the instant litigation." Nor, apparently, is there an unreported case representing substantially similar facts.

relevant Plan language is the requirement in the "Definition of Disability" that "the person is not working at any job for wage of profit," and Plaintiff's employment with his screen printing business constitutes such work, regardless of whether the company ever returned a profit; according to Defendant, Plaintiff is thus disqualified for disability under the terms of the Plan. Defendant argues that the denial of benefits must be upheld because it was the result of a deliberate reasoning process and is supported by substantial evidence, adding that defendant and the predecessor Administrator owe a duty to serve the best interests of all the beneficiaries of the plan, not just the best interest of Plaintiff.

## *B. Analysis*

I have already observed that the Plan grants the Plan Administrator discretion to determine eligibility for benefits; thus, the issue in this case is whether the Plan Administrator abused its discretion in denying LTD benefits to Plaintiff. For the following reasons, I find that the Plan Administrator abused its discretion in determining that airplane pilots covered under Gannett's LTD Plan are required to fulfill the terms of both the general three-prong definition of disability and the airplane pilot-specific definition.

Defendant cannot escape the language of the Plan.[14, 15] Section IV of the Plan is entitled

---

[14] *See Booth*, 201 F.3d 342-43 (setting out the language of the plan as one factor in a non-exhaustive list of factors to consider when determining whether an ERISA fiduciary has abused its discretion).

[15] To reiterate, Section IV of the Plan states the following "Definition of Disability," quoted in pertinent part (eliding two paragraphs addressing the exclusion of disabilities resulting form attempted suicide, self-inflicted injuries, acts of war, mental illness, alcoholism, and drug addiction):

> Disability exists when, due to a medically determinable sickness or accidental injury, all of the following conditions are met: (a) the person is unable to perform the material and substantial duties of his or her occupation for two years and unable thereafter to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience; (b) the person is not working at any job for wage or profit (unless as expressly authorized pursuant to the rehabilitation rules of this Plan); and (c) the
> (continued...)

Case 3:08-cv-00029-NKM-BWC   Document 26   Filed 10/08/08   Page 13 of 20   Pageid#: 266

"Definition of Disability." The Plan states, in its "Definition of Disability," that, "[i]n the case of airline pilots, the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure are included within the definition of disability." The pilot-specific definition, consisting of the fourth and final paragraph of the "Definition of Disability," which comes after two paragraphs spelling out exclusions from the definition, states that the pilot-specific provisions "are included within the definition of disability," but does not state that the pilot-specific provisions are "included within the 'Definition of Disability.'" Thus, it is ambiguous whether the pilot-specific provisions are meant to be "included within" the "Definition of Disability" or "within" some other unspecified part of an unspecified "definition of disability." It is ambiguous whether the pilot-specific provisions are intended to (i) enlarge or restrict the entire "Definition of Disability"; (ii) enlarge or restrict the entire first paragraph of the "Definition of Disability"; (iii) substitute for the phrase "medically determinable sickness or accidental injury," in the first paragraph of the "Definition of Disability"; or (iv) completely replace or (v) add on to one of the three prongs spelled out in the first paragraph of the "Definition of Disability."

This ambiguity is underscored by defense counsel's contention at oral argument that the

---

[15](...continued)
    person is under the regular care of a physician. The two-year period referred to in (a) is measured from the date immediately following the 26 continuous week elimination period set forth in [Section] III, ["Synopsis of Plan,"] above.

\* \* \*

    **In the case of airline pilots, the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure are included within the definition of disability.** Notwithstanding the foregoing, however, if the failure to pass is due to a drug or alcohol-related reason, the failure to pass is not included in the definition and no benefits are payable therefor under this Plan.

(M-017-18; emphasis added.)

-14-

pilot-specific definition is intended merely as a "jump start" for pilots. It is not in any way discernible how the pilot-specific definition is intended to provide a "jump start" for pilots, or that it could be reasonably construed to provide only a "jump start" for pilots who apply for LTD. Nor does the pilot-specific definition contain any proviso that it is to be considered "in addition to" the three-prong definition set forth in the first paragraph, or as a substitute for any element laid out in those three prongs. To be sure, the pilot-specific definition does not state, "This provision sets aside any requirements set forth elsewhere in this 'Definition of Disability.'"[16] Nonetheless, the "Definition of Disability" does indeed contain a paragraph specifically stating, "In the case of airline pilots," a certain set of circumstances will qualify the pilot as disabled. The Plan could have been drafted to clearly state that pilots must in all circumstances meet the general three-prong definition of disability laid out in the first paragraph of the "Definition of Disability," but it was not so drafted, and any other reading of the "Definition of Disability" is strained and unreasonable.

Contracts are interpreted under the law of the state in which the contract was made. *See Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 419 (Va. 2004). Under Virginia law, where the subject contract was consummated, the rules of contract interpretation apply to the construction of insurance agreements. *Id.* When the contract language is ambiguous and the intentions of the parties are not clear from the writing, "the policy must be strictly construed against the insurer and liberally in favor of the insured." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984)). Moreover, it

---

[16] I add that, in denying Plaintiff's eligibility for LTD, the Administrator stated: "You base this appeal on your interpretation that airplane pilots are only subject to the one paragraph. This is not the case. All employees eligible for benefits under this Plan are subject to the definition of disability in its entirety." (M-257.) However, nowhere does the Plan state that pilots or any other LTD-eligible participant "are subject to the definition of disability in its entirety."

-15-

is well-settled that "[a]ny ambiguity in an ERISA plan 'is construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured.'" *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 269 (4th Cir. 2002) (quoting *Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313-14 (4th Cir. 2002)); *see also Tester v. Reliance Standard Life Ins. Co.*, 228 F.3d 372, 375 (4th Cir. 2000). Here, to the extent the Plan language is ambiguous, the ambiguity must be construed against Aetna and in accordance with Plaintiff's reasonable expectations.[17]

Plaintiff reasonably expected that, in his circumstances, he would be covered by the LTD Plan because he satisfied the Plan's "Definition of Disability," which states that, "[i]n the case of airline pilots, the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure are included within the definition of disability." Defendant attempts to hang its hat upon two words – "included within" – while disregarding the rest of the pilot-specific definition, including the introductory phrase of the fourth paragraph: "In the case of airline pilots. . . ." I agree with Plaintiff that, "[i]n the case of airline pilots," the circumstances set forth in the fourth paragraph of the "Definition of Disability" results in the claimant being qualified for LTD benefits under the Plan, the general three-prong definition notwithstanding. To read the "Definition of Disability" any other way would, as Plaintiff contends, render the pilot-specific definition superfluous and meaningless; indeed, Defendant's interpretation of the "Definition of Disability" does, as Plaintiff contends, "read [the pilot-

---

[17] *See also, Booth*, 201 F.3d 342-43 (setting out "any external standard relevant to the exercise of discretion" in a non-exhaustive list of factors to consider when determining whether an ERISA fiduciary has abused its discretion). Here, the standard regarding the construction of insurance agreements and ERISA plans is a relevant external standard.

Case 3:08-cv-00029-NKM-BWC   Document 26   Filed 10/08/08   Page 16 of 20   Pageid#: 269

specific definition of disability] out of existence."[18] The logical, reasonable, and principled reading of the "Definition of Disability" is to find that it includes a pilot-specific definition stating that the "Definition of Disability," "[i]n the case of airline pilots," includes "the loss of a First Class medical certificate, the failure to pass a required physical examination and the loss of necessary licensure. . . ."

The pilot-specific definition must have been placed in the "Definition of Disability" to assure pilots that coverage under Gannett's LTD Plan would protect against the complete loss of a pilot's income should an eligible pilot lose the "necessary licensure" for a medical reason.[19] Participants who reasonably expect to rely upon this assurance, as phrased in this particular Plan,

---

[18] Defendant's arguments implicitly acknowledge that its interpretation of the Plan depends upon the pilot's provision being rendered a superfluity. If a pilot satisfied the general three-prong definition laid out in the first paragraph of the Definition of Disability, then almost certainly the pilot would lose the "necessary licensure" (a point Plaintiff has raised and Defendant has not bothered to counter); however, as the instant facts demonstrate, a pilot can lose the "necessary licensure" and not satisfy the general three-prong definition.

[19] Otherwise, the pilot-specific definition must have been placed in the "Definition of Disability" to mislead pilots to believe that they would be protected in those circumstances. A fiduciary can be liable for a breach of fiduciary duty if the plaintiff can show that the fiduciary knew or should have known that the plaintiff labored "under a material misunderstanding that [would] inure to his detriment. . . ." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001). "ERISA administrators have a fiduciary obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.'" *Id.* at 380 (citation omitted).
    Considering the pilot-specific provision, it is clear that the purposes and goals of the Plan encompassed a reassurance to pilots that, after the requisite time in Gannett's employment, they would be qualified for LTD under the pilot-specific definition, the general three-prong definition notwithstanding. *See Booth*, 201 F.3d at 342-43 (setting out factors to consider in determining whether an ERISA fiduciary has abused its discretion, including the purposes and goals of the plan and whether the fiduciary's interpretation is consistent with other provisions in the plan). I note also that a survey of cases suggests that plans often specifically state that there are provisions "for persons other than pilots, co-pilots, and crew of an aircraft." *See, e.g., Robilotta v. Fleet Boston Financial Corp. Group Disability Income Plan*, 2008 WL 905883 (E.D. N.Y. Mar. 31, 2008); *Doyle v. Liberty Life Assur. Co. of Boston*, 511 F.3d 1336 (11th Cir. 2008) (superseded on rehearing by ___ F.3d ___, 2008 WL 4272748 (11th Cir. Sept. 18, 2008)); *Turner v. Fresenius Medical Care North America*, 2006 WL 2805160 (S.D. Miss. Sept. 25, 2006); *Denmark v. Liberty Life Assur. Co. of Boston*, 2005 WL 3008684 (D. Mass. Nov. 10, 2005); *Ayer v. Liberty Life Assur. Co. of Boston*, 382 F.Supp. 2d 162, 177 (D. Me. 2005); *see also Arfsten v. Frontier Airlines, Inc. Retirement Plan for Pilots*, 967 F.2d 438, 440-41 (10th Cir. 1992) ("the Plan defines disability as . . . the permanent inability of a Participant to pass the periodic FAA Physical Examination required for a pilot in his status, by reason of accident, sickness, or natural deterioration, excluding, however, intentionally self-inflicted injury or habitual use of narcotics").

Case 3:08-cv-00029-NKM-BWC   Document 26   Filed 10/08/08   Page 17 of 20   Pageid#: 270

are entitled to the benefit. My construction of this Plan is that it specifically contemplates the instant circumstances and protects an eligible pilot participant,[20] such as Plaintiff, from the abrupt and unexpected end of his career, and the loss of the investment in his career and the continued benefit of that investment, due to a medical condition that would not adversely affect the continued employment and income-earning capability[21] of most other people.[22, 23]

### C. Attorney's Fees, Costs, and Pre-and Post-Judgment Interest

Regarding Plaintiff's motion for attorney's fees and costs, the Court is completely within its discretion to order them. *See* 29 U.S.C. § 1132(g); *Quesinberry v. Life Insurance Company of North America*, 987 F.2d 1017, 1028 (4th Cir. 1993). The record is clear that Plaintiff has been denied his LTD benefits; while the payment of attorneys' fees could be a serious hardship to Plaintiff, Aetna likely has the ability to satisfy an award of attorneys' fees. The record indicates that the merits of Plaintiff's position have been strong and consistent throughout the proceedings below. Additionally, the matter is relatively modest in terms of dollars, and if fees were not

---

[20] I repeat that Plaintiff served the requisite number of years in service, that he was awarded benefits under Gannett's LTD Plan for a year, and that there is otherwise no question as to his eligibility.

[21] *See* n. 10, *supra*, and relevant text, regarding Plaintiff's reduced wage- and income-earning capability subsequent to the loss of his FAA license.

[22] In addition to diabetes, the onset of epilepsy or the loss of an eye in an accident could result in a pilot's fulfilling the requirements laid out in the pilot-specific definition of disability and being grounded by the FAA. These conditions, however, do not necessarily render a person unable "to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience," or require "the regular care of a physician," as laid out in the first paragraph of the "Definition of Disability."

[23] To recapitulate, my finding is based upon consideration of the following factors set out in *Booth*, 201 F.3d 342-43: (i) the language of the plan, (ii) the purposes and goals of the plan, (iii) the inconsistency of the Administrator's interpretation of the general three-prong paragraph of the "Definition of Disability" with the pilot-specific paragraph of the "Definition of Disability," and (iv) the application of an external standard regarding the exercise of discretion (here, the applicable standard regarding the construction of insurance agreements in Virginia). The materials and arguments presented before the Court are insufficient for me to determine the fiduciary's motives in denying Plaintiff's claim and whether it may have suffered any conflict of interest; moreover, the language of the Plan forms a sufficient basis for my determination that the Administrator abused its discretion.

Case 3:08-cv-00029-NKM-BWC Document 26 Filed 10/08/08 Page 18 of 20 Pageid#: 271

awarded in cases such as these, they typically would not be brought. This would be a danger to all participants, to the public, and to the remedial purposes of ERISA itself. Moreover, the resolution of this issue provides a benefit to other Plan participants, given that it provides clarity regarding the Plan's "Definition of Disability" applicable to pilots. In sum, the relevant factors weigh in favor of awarding fees and costs. *Quesinberry*, 987 F.2d at 1029 ("[t]his five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for attorneys' fees" (citation omitted)); *Cox v. Reliance Standard Life Insurance Company*, 235 F.Supp. 2d 481, 483 (E.D. Va. 2002). Accordingly, Plaintiff's counsel will be ordered to file a complete petition for attorney's fees and costs.

Plaintiff's counsel will also be ordered to submit a proposed order of judgment calculating the exact back benefits and interest due and owing as of the date of judgment. Regarding pre-judgment interest, the award and rate of pre-judgment interest is within the discretion of the Court, and the Fourth Circuit, in an ERISA disability case, has explicitly approved of a federal court's reliance upon the Virginia judgment rate. *See Quesinberry*, 987 F.2d at 1030-31; Va. Code § 6.1-330.54. Pre-judgment interest will be awarded here, at the Virginia rate, because Plaintiff has been deprived of the use of this money since the predecessor Plan Administrator reversed its initial award and cut off Plaintiff's LTD benefits, and Defendant upheld the denial of his benefits. Regarding post-judgment interest, the Court is required to award it pursuant to 28 U.S.C. § 1961, and that post-judgment interest should apply to the entire amount awarded, including the pre-judgment interest. *Quesinberry*, 987 F.2d at 1031-32.

### IV. CONCLUSION

For the reasons stated herein, Plaintiff's motion for summary judgment will be granted, and Defendant's motion for summary judgment will be denied. Furthermore, Plaintiff's request

-19-

for an award of attorney's fees and costs will be granted; accordingly, Plaintiff's counsel will be directed to file a complete petition for attorney's fees and costs. Additionally, Plaintiff's counsel will be directed to submit a proposed order of judgment calculating the exact back benefits and pre-and post-judgment interest due and owing as of the date of judgment.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 8th day of October, 2008.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE